**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

AMANDA C. FOSTER                                      CIVIL ACTION

VERSUS                                                       CASE NO. 16-1270

PRINCIPAL LIFE INSURANCE COMPANY, et al.      SECTION: "G"(2)

<u>ORDER AND REASONS</u>

This is an action for review of the denial of long-term disability benefits and life insurance waiver of premium benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). The parties, Plaintiff Amanda Foster ("Foster") and Defendant Principal Life Insurance Company ("Principal"), have filed cross motions for judgment on the administrative record.[1] Having considered the motions, the memoranda, the record, and the applicable law, the Court grants judgment in favor of Principal. The Court declines to award attorney's fees or costs to either party.

<u>I. Background</u>

**A.      Factual Background**

Amanda Foster began working at the law firm Sullivan, Stolier & Knight in November 2005 as a healthcare attorney.[2] Foster described her job duties as "review and draft leases and agreements; research and advise clients regarding government laws and regulations; represent

---

[1] Rec. Docs. 25, 26.

[2] Rec. Doc. 25-1 at 1.

clients in administrative appeals; draft compliance plans."[3] On March 8, 2013, Foster decreased her work hours to part-time capacity, allegedly due to intractable headaches.[4] Foster took complete disability leave from Sullivan, Stolier & Knight on July 1, 2013.[5]

Principal Life Insurance Company ("Principal") issued a group benefits plan to Sullivan, Stolier & Knight that provides long term disability benefits ("LTD")[6] and life insurance coverage[7] to eligible employees ("Group Policy").[8] The group term life insurance policy contains a "Coverage During Disability" provision ("LCDD"),[9] which Foster claims entitles her to life insurance waiver of premium benefits ("LWOP") during the period of her total disability.[10]

There is no dispute that the Group Policy and Foster's claims for LTD and LWOP are governed by the Employee Retirement Income Security Act of 1974, codified at 29 U.S.C. § 1001, et seq. ("ERISA").[11] It is also undisputed that the Group Policy confers upon Principal the "discretion to construe or interpret the provisions of [the] Group Policy, to determine eligibility

---

[3] AR 5222.

[4] Rec. Doc. 25-1 at 1.

[5] *Id.*; Rec. Doc. 2601 at 2.

[6] GLT 1026572, AR 1 – 100.

[7] GL 1026572, AR 103 – 184.

[8] Rec. Doc. 26-1 at 1.

[9] AR 141.

[10] The life insurance waiver of premium ("LWOP") is a benefit of the group life insurance policy's coverage during disability provision ("LCDD"). Although Foster refers to her claim as a denial of LWOP, Principal refers to the claim as LCDD.

[11] Rec Doc. 26-1 at 1.

for benefits, and to determine the type and extent of benefits, if any, to be provided"[12] for both LTD and life insurance benefits.[13] Thus, Principal served as the insurer and the plan administrator.[14]

## B.    *Procedural Background*

On July 8, 2013, Foster filed a claim for long-term disability benefits pursuant to the Group Policy issued by Principal, alleging that she was "unable to practice law due to pain of headaches" as of March 8, 2013.[15] Principal approved Foster's LTD claim effective September 4, 2013, after the 180 day elimination period was met.[16] Foster also claims entitlement to LWOP benefits during her disability.

On May 1, 2014, Principal denied Foster's claim for Life Coverage During Disability ("LCDD") benefits that would have covered her life insurance premiums while she was disabled.[17] Foster appealed this decision on September 30, 2014,[18] alleging that Dr. D.C. Mohnot, Foster's treating neurologist, and Phyllis Shnaider, L.C.S.W., Foster's therapist, both opined that Foster

---

[12] AR 22; Rec. Doc. 26-1 at 1; see Rec. Doc. 25-1 at 9.

[13] The life insurance policy similarly provides: "The Principal has complete discretion to construe or interpret the provisions of this group insurance policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided." AR 117.

[14] Rec. Doc. 25-1 at 10; "To the extent that benefits are provided by the Group Policy, the administration and payment of claims will be done by Us [Principal] as an insurer." AR. 66.

[15] AR 5634.

[16] AR 4677.

[17] AR 4022. Principal explained that based on the medical information received, Foster was capable of part-time sedentary work; thus, Foster was not considered "Totally Disabled" under the definition of disability in the life insurance policy. AR 4023.

[18] AR 3824-3825.

was unfit for full or part-time employment.[19] On December 1, 2014, Principal upheld its denial of LCDD, noting that the medical evidence demonstrated that Foster was not unable to work in any occupation on a full or part-time basis and that because Foster stopped working full-time on March 8, 2013, her group life insurance coverage ceased on April 1, 2013.[20]

By correspondence dated December 18, 2014, Principal terminated Foster's LTD benefits beyond December 9, 2014,[21] concluding that Foster no longer met the Policy's definition of disability,[22] and denied Foster's appeal as to the LCDD claim.[23] Foster appealed Principal's termination of LTD benefits on January 23, 2015, and provided Principal with additional medical records on April 28, 2015.[24] Principal denied the appeal on July 24, 2015.[25] Foster filed a second appeal on July 31, 2015.[26] After receiving additional records and obtaining a neuropsychological evaluation, Principal upheld its prior determination and denied additional benefits on December 21, 2015.[27] On January 27, 2016, Foster provided Principal with additional evidence to support her claim.[28] On February 3, 2016, Principal informed Foster that all appeal options had been

---

[19] *Id.*

[20] AR 2164.

[21] AR 2151 – 2154.

[22] *Id.*

[23] *Id.*

[24] AR 2149, 2017–2023, 1158-1164.

[25] AR 1806-1809.

[26] AR 1799.

[27] Rec. Doc. 26-1 at 14, 15.

[28] *Id.* at 15.

exhausted.[29] Foster then instituted this litigation.

## II. Parties' Arguments

*A.*     ***Foster's Motion for Judgment on the Administrative Record***

Foster asserts that she is entitled to judgment in her favor and against Principal awarding her LTD disability benefits retroactive to the date of the discontinuance, with judicial interest, and reinstatement of benefits, including LWOP.[30]

    **1.**     **Foster's Arguments in Support of the Motion**

       **a.**     **Principal's conflict of interest in acting as plan administrator and payer of benefits must be considered by the Court in determining whether Principal abused its discretion in denying benefits**

Foster concedes that Principal's denial of benefits is reviewed under an abuse of discretion standard.[31] However, Foster argues, when an insurance company acts as plan administrator and ultimate payer of benefits, a structural conflict of interest exists that must be considered by the Court in determining whether the plan administrator abused its discretion in denying benefits.[32] Foster contends that Principal, as plan administrator and payer of benefits, disobeyed ERISA's mandate that it discharge its duties in the interest of plan participants and beneficiaries, and instead, Principal went out of its way to deny Foster benefits.[33] This inherent conflict of interest, Foster maintains, should weigh in favor of finding that Principal abused its discretion in denying Foster

---

[29] *Id.*

[30] Rec. Doc. 25-1 at 24.

[31] *Id.* at 9.

[32] *Id.* at 10.

[33] *Id.* at 10-11.

benefits.[34]

### b. Foster is plainly disabled under the terms of the Group Policy

In support of the motion for judgment on the administrative record, Foster argues that she is plainly disabled under the terms of the Group Policy.[35] According to Foster, her inability to continue to perform at least one of the essential duties of her occupation as a healthcare attorney is evident from her medical records.[36] Foster asserts that her medical records provide overwhelming evidence of "persistent, intractable headaches."[37] Foster argues that her medical records demonstrate that she has a history of debilitating headaches, which began to increase in intensity and frequency in 2011.[38] Foster asserts that she has daily headaches, as well as severe headaches between two to three times per week.[39] Foster further asserts that she has tried multiple interventions, such as hypnosis, acupuncture, rest, pharmaceuticals, and Botox, which have been ineffective.[40]

Second, Foster maintains that her doctors have "unanimously supported" her disability claim.[41] In support, Foster cites to the findings of her treating physicians and other healthcare professionals. Foster argues that Dr. D.C. Mohnot, her treating neurologist and headache specialist,

---

[34] *Id.* at 10.

[35] *Id.* at 11.

[36] *Id.*

[37] *Id.*

[38] *Id.* at 12.

[39] *Id.*

[40] *Id.* at 13.

[41] *Id.* (citing AR 408, 871, 1000–1001, 1430–1445).

opined on June 1, 2013, that Foster is unable to work due to intractable migraines for which he is treating Foster with Hydrocodone, Topomax, Botox, and Notripline.[42] Additionally, Foster contends, Phyllis Schneider, LCSW, head of Clinical Social Work for Ochsner Health System, explained on September 26, 2014, that Foster has "disabling headaches several times weekly," and that "[i]t is not realistic to plan for Ms. Foster to work at a job requiring scheduling and commitments to clients when she is unable to predict when she is well and when she is unable to function."[43] According to Foster, Ms. Schneider opined on January 27, 2016, that Foster should not work as an attorney until "her migraine headaches can be controlled or eliminated."[44] Foster also argues that Dr. Narinder Gupta, pain management, opined that Foster is fully disabled.[45] Finally, Foster argues that Dr. Shelly Savant, IME, recognized that Foster suffers from "refractory pain sequelae" which prevents her from returning to work as a healthcare attorney and that because a migraine is a clinical diagnosis, the lack of objective findings on the imaging studies is unsurprising.[46] Foster asserts that Dr. Savant agreed that her history, examination, and medical records are consistent with the diagnosis of migraine headaches as opined by Dr. Mohnot.

Third, Foster argues that other evidence, including an email from a fellow attorney describing an episode at work and a declaration from her employer, Jack Stolier, support her claim that her medical condition precluded her from meeting the demands of her practice as a healthcare

---

[42] Rec. Doc. 25-1 at 13; AR 408.  Dr. Mohnot noted the migraines were "disabling."  AR 871.

[43] Rec. Doc. 25-1 at 13; AR 1000-1001.

[44] Rec. Doc. 25-1 at 13; AR 298-299.

[45] Rec. Doc. 25-1 at 13; *See* AR 1430-1445.

[46] Rec. Doc. 25-1 at 13.

attorney,[47] which required "the utmost ability to concentrate" and "maintain a high level of intellectual ability."[48] Foster contends that her disability application also supports her claim for benefits as it details specific job requirements including drafting and reviewing lease agreements, researching and advising clients on government laws and regulations, representing clients in administrative appeals, and drafting compliance plans.[49] Foster contends that all of this evidence demonstrates that Foster is plainly precluded from performing the "intellectually rigorous job duties" associated with her job as a healthcare attorney.[50] According to Foster, the Social Security Administration has determined that her medical condition precludes her from performing the duties of any occupation and that at least two of Principal's own peer reviewing doctors agreed that Foster would not be able to tolerate her job duties.[51]

### c. Principal's denial of LTD and LWOP benefits based on a lack of objective evidence is an abuse of discretion

Foster asserts that Principal's denial of her LTD and LWOP claims based on an alleged lack of objective proof of Plaintiff's migraines constitutes an abuse of discretion.[52] According to Foster, migraines are diagnosed clinically, so an absence of abnormalities on diagnostic testing is

---

[47] *Id.* at 14 (citing AR 509, 1183)

[48] *Id.* (citing AR 545).

[49] *Id.*

[50] *Id.* at 15 (citing AR 1239–1245).

[51] *Id.* Foster does not cite to social security records within the Administrative Record and this issue appears to be beyond the scope of the Court's review.

[52] *Id.*

consistent with a headache disorder.[53] Foster cites to a decision by a court in the Northern District of California, *Hegarty v. AT&T Umbrella Benefit Plan No. 1*, in which she asserts that the court found that the absence of neurological deficits, cognitive abnormalities, and observable objective findings did not support the denial of benefits where a plan member had migraines.[54] Foster contends that she is similar to the plaintiff in *Hegarty* but that unlike the *Hegarty* plaintiff, Foster argues, her cognitive deficits have been demonstrated in neuropsychiatric testing by Dr. Chafetz.[55] Foster also cites to a decision by a court in the Western District of North Carolina in which Foster asserts that the court held that denial of benefits to a claimant who suffered from migraine headaches constituted an abuse of discretion.[56]

### d. Principal's failure to analyze Foster's medical condition in relation to the actual duties of her occupation is an abuse of discretion

Foster next asserts that Principal's failure to consider her medical condition in relation to the actual duties of her occupation constitutes an abuse of discretion.[57] According to Foster, the Fifth Circuit has made clear that a plaintiff must be able to perform all material duties of plaintiff's occupation in order to be found not disabled under an "own-occupation policy" like the policy at issue in this case.[58] Foster asserts that an insurer abuses its discretion when it determines that a

---

[53] *Id.*

[54] *Id.* at 15–16 (citing *Hegarty v. AT&T Umbrella Benefit Plan No. 1*, 109 F.Supp.3d 1250, 1258 (N.D. Cal. 2015)).

[55] *Id.* at 16 (citing AR 362).

[56] *Id.* (citing *Boyd v. Liberty Life Assurance Co. of Boston*, 362 F.Supp.2d 660, 669 (W.D.N.C. 2005)).

[57] *Id.*

[58] *Id.* (citing *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262 (5th Cir. 2004)).

claimant is capable of working without providing an analysis of the demands of claimant's job.[59] Foster argues that in each of Principal's denial letters, Principal failed to address the material duties of Foster's occupation as a healthcare attorney.[60] Moreover, Foster asserts that Principal did not ask its reviewing medical experts to comment on whether Foster would be able to perform such duties.[61] Foster avers that Principal never mentioned the mentally taxing aspects of her job which required complicated analytical skills and the ability to manage a caseload involving complicated government relations, demanding clients, court deadlines, etc.[62] Foster contends that such failure to consider Foster's condition in light of her job duties as a healthcare attorney is an abuse of discretion.[63]

### e. Principal's select review of the evidence is an abuse of discretion

Foster next argues that Principal abused its discretion by focusing on evidence that supported denial of Foster's claim while ignoring other evidence that supported her entitlement to benefits.[64] As an example, Foster asserts that Principal refused to address the testimony of her co-worker and employer corroborating her symptoms.[65] According to Foster, Principal received a

---

[59] *Id.* at 17 (citing *Elliott v. Metropolitan Life,* 473 F. 3d 618, 618 (6th Cir. 2006), *Burtch v. Hartford*, 314 Fed. Appx. 750 (5th Cir. 2009), *Miller v. Am. Airlines, Inc.*, 632 F. 3d 837, 855 (3d Cir. 2011), *Roig v. The Limited Long Term Disability Program,* 2000 WL 1146522, *14 (E.D. La. 2000)).

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* (citing *Rucker v. Life Ins. Co. of N. Am.*, 2012 WL 956507, at *9 (E.D. La. 2012); *Digiamco v. Liberty Life Assurance Co. of Boston*, 2004 WL 1628588, at *6 (N.D. Cal. 2004); *Burdett v. Unum Life Ins. Co. of Am.*, 2008 WL 4469094, at *14 (E.D. La. 2008)).

[64] *Id.* at 18.

[65] *Id.*

total of seven peer review medical reports, only three of which could arguably support Foster's ability to return to work.[66] However, Foster argues, the opinions of the three doctors[67] that could support a finding that Foster could return to work did not address Foster's job duties as a healthcare attorney.[68] Moreover, Foster argues, the reviewing opinions of those three doctors that there is no clinical evidence supporting a finding of debilitating migraine headaches is inconsistent with Foster's medical records, as well as the diagnosis of her treating doctors and Dr. Savant after an independent medical examination.[69] While an insurer does not have to give deference to a treating physician, Foster recognizes, the U.S. Supreme Court has held that an abuse of discretion may occur where an administrator emphasizes a medical report that favors a denial of benefits and de-emphasizes other reports that suggest a contrary conclusion.[70] Foster contends that Principal abused its discretion in relying on the opinions of peer review physicians who were not advised of Foster's job duties and deemphasizing the opinions of her treating physicians and other peer review physicians.[71]

### f. Principal's denial of Foster's life insurance waiver of premium ("LWOP") claim is an abuse of discretion

---

[66] *Id.*

[67] Foster contends that only the opinions of Dr. Hoenig, Dr. Miller, and Dr. Chafetz arguably support the conclusion that Foster should be able to return to full time sedentary work.  *Id*. at 20.

[68] *Id.*

[69] *Id.* at 20-21.

[70] *Id.* at 21 (citing *Metlife v. Glenn*, 554 U.S. 105, 118 (2008)). Foster contends that Principal relied on the peer reviews by Drs. Miller, Hoenig and Chafetz and failed to address the opinions of Drs. Condon and Kondapaneri because those opinions support Foster's inability to return to work.  *Id.*

[71] *Id.*

Next, Foster argues that Principal's denial of Foster's life insurance waiver of premium claim also constitutes an abuse of discretion.[72] Foster contends that Principal relied on the opinion of Dr. Pranathi Kondapaneri who determined that Foster would be able to work on a part-time basis, while failing to address the opinion of another peer review physician, Dr. Ethel F. Condon, who found that Foster was totally disabled and unable to work at all.[73] Foster avers that Dr. Condon's opinion mirrors that of Foster's treating physicians and therapist, Dr. Mohnot, Dr. Gupta, and Ms. Shnaider.[74] Foster contends that in denying her LWOP appeal, Principal abused its discretion by focusing only on the opinions supporting denial of the claim and ignoring the opinions in favor of her claim.[75]

Foster also challenges Principal's interpretation of the group life insurance policy's provisions. Foster argues that Principal denied LWOP benefits on May 1, 2014, concluding that Foster ceased to be a full-time employee on April 1, 2013, and therefore, was no longer a "member" entitled to LWOP coverage.[76] Foster argues that Principal does not cite to any policy provisions that would support the proposition that Foster lost coverage when she was forced to decrease her hours due to her worsening medical condition.[77] Foster contends that her attempt to decrease her hours in order to continue working before taking disability leave "should be

---

[72] *Id.* at 22.

[73] *Id.* (citing AR 647–649).

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

commended" but that Principal is unfairly penalizing her for trying to work.[78] According to Foster, she was a full-time employee before her health began to deteriorate, she qualified for the LWOP benefit under the Policy, and Principal should not be able to benefit from Foster's attempt to continue working.[79] Foster argues that the unsuccessful three month trial period of part-time work further evidences that she is totally disabled and Principal's failure to discuss this in its letters denying the LWOP claim demonstrates that Principal was primarily focused on denying benefits.[80]

### 2. Principal's Arguments in Opposition to Foster's Motion

#### a. Under the deferential standard of review, Principal's determination can only be reversed if it is not supported by substantial evidence in the administrative record

Principal notes that Foster concedes that the Group Policy grants Principal discretionary authority to determine eligibility for benefits and to construe the terms of the plan.[81] Thus, Principal contends, its denial of benefits can only be reversed if the denial was not supported by substantial evidence in the administrative record.[82] Substantial evidence is such evidence that a reasonable mind might accept as sufficient to support a conclusion.[83] A plan administrator's determination is an abuse of discretion only if there is no rational connection between the known

---

[78] *Id.* at 23.

[79] *Id.* at 23–24.

[80] *Id.* at 24.

[81] Rec. Doc. 30 at 11.

[82] *Id.*

[83] *Id.*

facts and the decision.[84] According to Principal, the Fifth Circuit has noted that the review of the administrator's decision need not be complex or technical and need only assure that the plan administrator's decision falls somewhere on the continuum of reasonablenesss.[85] Moreover, the job of weighing conflicting medical opinions is not a job for the courts; rather, that job has been given to the plan administrators of ERISA plans.[86]

### b. No evidence exists of a conflict of interest

Principal argues that whether a conflict of interest exists in the administration of the claim is just one factor in determining whether the plan administrator abused its discretion in denying benefits.[87] Principal contends that Foster cites to no evidence for the proposition that Principal's determination as to Foster's benefits was tainted by a conflict of interest.[88] Principal argues that it provided Foster with a thorough and unbiased review of her claims, including a request for an independent neuropsychological evaluation.[89] Principal avers that it attempted on several occasions to actively further dialogue between Dr. Mohnot and the independent specialist involved in claim review.[90] Principal further states that it is within its discretion to depart from a treating physician's opinion and adopt the conclusions of a medical consultant as long as the medical

---

[84] *Id.*

[85] *Id.* at 12 (citing *Holland v. Int'l Paper Co. Retirement Plan,* 576 F.3d 240, 246 (5th Cir. 2009) (quoting *Corry v. Liberty Life Assur. Co. of Boston,* 499 F.3d 389, 398 (5th Cir. 2007))).

[86] *Id.* (citing *Corry,* 499 F.3d at 401).

[87] *Id.*

[88] *Id.* at 13.

[89] *Id.*

[90] *Id.*

consultant provided non-arbitrary explanations based on the evidence, and the plan itself explained its decision.[91]

### c. Foster cannot demonstrate an inability to perform her sedentary level occupation

According to Principal, Foster cannot meet her burden to demonstrate that she is unable to perform the material duties of her own occupation, as her claim rests entirely on self-reported headaches.[92] Principal contends that even if Foster cannot prove her headaches in any other way than through her own reports, she is still required to present objective proof of the severity of her headaches that prevent her from performing the material duties of her occupation as a healthcare attorney.[93] According to Principal, none of Foster's treating physicians or Foster's social worker, Ms. Shnaider, placed "actual restrictions" on Foster, and her neuropsychological examination confirmed that Foster had the ability to sustain high cognitive functioning despite experiencing a headache.[94] Principal contends that, contrary to Foster's assertions, it considered Foster's medical condition in relation to the actual duties of her occupation in testing her cognitive functioning despite experiencing a headache.[95]

Moreover, Principal argues, although it is Foster's burden to demonstrate that she cannot perform the material and substantial duties of her own occupation, she does not explain in her

---

[91] *Id.*

[92] *Id.* at 14.

[93] *Id.* at 14–15 (citing *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16–17 (1st Cir. 2003)).

[94] *Id.* at 16 (citing AR 350–374).

[95] *Id.* Principal asserts that Foster does not claim that she cannot sit at a desk as the result of her headaches shown by the fact that she wrote two books after leaving her employment and going on disability. *Id.*

motion what duties of her occupation as a healthcare attorney she is unable to perform as a result of her condition.[96] Principal contends that several independent medical specialists in the areas of psychology, psychiatry and neurology, and neuropsychology confirmed the absence of functional impairment as a result of Foster's condition.[97] Contrary to Foster's assertion, Principal maintains that the independent consultants were provided with all documents in Foster's claim file, including her claim submissions and supplemental forms describing Foster's job duties as a healthcare attorney.[98] According to Principal, Foster's criticism of the independent consultants' review is unavailing, because independent consultants do not render opinions as to an individual's ability to perform a certain occupation but rather evaluate an individual's records to describe restrictions and limitations.[99] Because there is a rational connection between the known facts and medical opinions in the administrative record and Principal's determination that Foster is not entitled to any additional benefits, Principal argues, Principal's decision falls within "the continuum of reasonableness" and should be upheld.[100]

### d. Foster's headaches are connected to psychological difficulties

Additionally, Principal argues, the denial of benefits should be upheld as reasonable, because Foster's headaches appear to be connected to Foster's psychological difficulties.[101]

---

[96] *Id.*

[97] *Id.*

[98] *Id.* at 17 (citing AR 4486, 5222).

[99] *Id.*

[100] *Id.* at 18.

[101] *Id.* (citing AR 2185, 2177, 1903–1904).

Principal asserts that Foster's motion is completely void of any discussion of the detailed psychotherapy notes which provide an undeniable nexus between Foster's psychological difficulties and her headaches.[102] Principal asserts that Ms. Shnaider, Foster's treating social worker, repeatedly describes Foster's ability to defer her headaches until after an important event or talk them down.[103] Principal concludes that Foster's headaches are a symptom of an emotional and/or mental disorder rather than physical in nature based on Ms. Shnaider's classification of Foster's headaches as psychogenic and somatic.[104] According to Principal, Foster's claim file does not contain any objective evidence that such "emotional and/or mental disorder" had become disabling.[105]

      e.  **If Foster's symptoms are severe enough to prevent her from performing the material duties of a healthcare attorney, then Foster's claim is subject to the mental health condition limitation**

Finally, even if the Court were to find that Foster had met her burden of demonstrating that her symptoms are severe enough to prevent her from performing the material duties of her occupation as a healthcare attorney, Principal argues, Foster's claim would be subject to the Group Policy's mental health condition limitation provision,[106] which limits benefits available for a mental health condition,[107] such as somatic symptom disorder, to a 24-month period.

---

[102] *Id.*

[103] *Id.* (citing AR 5155, 5154, 5152, 5148, 5182, 3752, 3759, 366).

[104] *Id.*

[105] *Id.*

[106] *Id.* at 19 (citing AR 48).

[107] *Id.* (citing AR 13). The Group Policy provides that a "Mental Health Condition" includes a condition categorized in the current edition of the American Psychiatric Associations Diagnostic and Statistical Manual of Mental Disorders or its successor. AR 13.

### f. Principal's denial of Foster's claim for life coverage during disability benefit was reasonable

Principal next argues that its determination to deny Foster's claim for LCDD benefits is also reasonable.[108] According to Principal, even the ability to work part time in any occupation disqualifies a claimant from the LCDD benefit, and the evidence in the record supports Principal's determination to deny Foster such benefit.[109] Moreover, Principal contends that the Group Policy clearly states that only employees working at least 30 hours per week are entitled to life insurance coverage and, as a result, LCDD coverage.[110] Thus, under the plain terms of the Group Policy, Principal argues that Foster lost life insurance coverage when she reduced her hours below full time or 30 hours per week.[111] Principal maintains that its denial of LCDD benefits was squarely aligned with the plain language of the Group Policy and was not arbitrary and capricious.[112]

### g. Foster's request for attorney's fees, costs, and interest is premature

Finally, Principal contends that Foster's request for attorney's fees, costs, and interest is premature.[113] Moreover, Principal asserts, these claims are baseless as no evidence exists that Principal was "culpable" or its position entirely without merit in light of the evidence in the

---

[108] *Id.*

[109] *Id.* (citing AR 114).

[110] *Id.* at 20 (citing AR 112–113).

[111] *Id.*

[112] *Id.*

[113] *Id.* at 20–21.

administrative record.[114]

Thus, Principal contends that Foster's motion for judgment should be denied and Principal's cross motion for judgment should be granted.[115]

### 3. Foster's Arguments in Reply to Principal's Opposition

#### a. Foster satisfied her burden of proving her disability

In reply, Foster maintains that she has satisfied her burden of proving that her headache disorder prevented her from performing her duties as a healthcare attorney.[116] Foster asserts that she provided Principal with medical records, opinions from at least three of her doctors, a headache diary, a sworn statement from her employer, her attendant at an IME, and opinions from two of Principal's peer reviewing doctors, who agreed that Foster is unable to perform her job duties.[117] Moreover, Foster argues that her psychotherapist's medical records further substantiate that she suffers from intractable headaches.[118] Foster contends that she tried hypnotherapy with Phyllis Shnaider, LCSW, after other treatments failed including acupuncture, Botox, massage therapy, injections, medication, tens unit, dilation of sinus cavity, biofeedback, and dietary changes.[119] Foster contends that while her records discuss certain stressors that might cause headaches, including self-esteem issues, relationship issues, over-productivity, etc., nearly every single chart

---

[114] *Id.* at 21.

[115] *Id.*

[116] Rec. Doc. 35 at 1.

[117] *Id.*

[118] *Id.* at 1–2.

[119] *Id.* at 2.

references persistent headaches.[120]

Foster contests Principal's statement that her treating physicians and therapist have not placed any restrictions or limitations on Foster and cites to evidence in the record, which Foster represents establishes that doctors have placed restrictions on her.[121] According to Foster, Principal never asserted that it denied Foster's claim due to a lack of specific restrictions from her treating doctors.[122] Foster argues that if Principal had done so, she would have asked her doctors to provide more specificity as to restrictions placed on her if necessary.[123] Foster contends that Principal's argument that Foster's doctors did not outline specific restrictions is another example of impermissible post hoc rationale for the denial of benefits.[124]

Foster further argues that her doctors, as well as Principal's doctors, discuss specific aspects of her job that she cannot perform, including workplace stress, prolonged computer use, avoidance of prolonged sitting and standing, and avoidance of significant light and sound exposure.[125] Foster also points to a statement by her employer that her headaches "impaired and prohibited her from the practice of law."[126] Foster further asserts that she wrote to Principal explaining that her headaches impact her on a daily basis, that she spends three to four days per

---

[120] *Id.*

[121] *Id.* at 2–4 (citing AR 871, 1255–1257, 1763–1764, 3459, 1181, 1476, 1433, 2792, 298–299, 647–649, 860–861, 847).

[122] *Id.* at 4.

[123] *Id.*

[124] *Id.* (citing *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839 (6th Cir. 2000)).

[125] *Id.* at 4–5.

[126] *Id.* at 5 (citing AR 1183).

week in bed because of headache pain, and that on certain days she cannot drive.[127] Foster argues that the unpredictability of her severe headaches is another factor that prevented her from continuing to perform her job duties as a healthcare attorney on a consistent basis.[128] According to Foster, she is highly motivated, which explains her desire to write on her own time when she is well enough to do so.[129] Foster contests Principal's argument that there is no objective clinical evidence of her headaches, as her doctors and three peer reviewing doctors state that Foster's detailed headache diary constitutes such evidence.[130]

### b. Principal did not address her actual job requirements

Next, Foster argues that Principal failed to address Foster's job requirements.[131] Foster contends that Dr. Chafetz, who performed the neuropsychiatric examination of Foster, stated that he could not opine on Foster's legal reasoning and that Foster could perform complex tasks if they did not involve "much oversight and responsibility."[132] According to Foster, she was a partner-level attorney at the time she stopped working, and her job "clearly involved responsibility and oversight."[133] Foster avers that she submitted sufficient evidence that her job required a high level of executive function and that she scored in the 45% during neuropsychological testing of her

---

[127] *Id.* (citing AR 3824–3825).

[128] *Id.*

[129] *Id.*

[130] *Id.* at 6 (citing AR 1763, 847, 1181, 1679, 648).

[131] *Id.*

[132] *Id.* (citing AR 367).

[133] *Id.*

executive functioning skills, which Foster asserts is lower than her estimated "pre-morbid capacity."[134] Foster argues that Principal never asked any of its peer reviewing doctors if they believed that Foster could perform her previous job duties as a healthcare attorney.[135]

Foster also contests Principal's assertion that the neuropsychiatric testing revealed no deficits.[136] According to Foster, when compared to her pre-morbid intellectual capacity, it is clear that her chronic headaches disorder has caused deficits.[137] In particular, Foster avers that her full scale IQ score was 16 points lower than her pre-morbid estimated IQ.[138] Foster further avers that her scores for learning and memory were in the average range, which Foster asserts is consistent with her complaints of memory loss.[139] By contrast, Foster asserts that she scored in the 96–98th percentile on the LSAT.[140]

Regardless, Foster argues that the usefulness of neuropsychological testing is limited in the context of evaluating a disability claim based on migraine headaches.[141] Moreover, Foster asserts that the opinion of the doctor who performed the neuropsychological testing contains

---

[134] *Id.* at 6–7 (citing AR 545, 1160–1164, 1239–1245, 362).

[135] *Id.* at 7 (citing *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F.Supp.2d 546, 564 (W.D. Pa. 2009); *Moore v. Life Ins. Co. of N. Am.*, 2011 WL 10453967, at *5 (E.D. La. 2011)).

[136] *Id.*

[137] *Id.*

[138] *Id.* (citing AR 360).

[139] *Id.* (citing AR 364).

[140] *Id.* (citing AR 358).

[141] *Id.* at 8 (citing *Hegarty*, 109 F.Supp.3d 1250).

misstatements.[142] In particular, Foster contends that his opinion that her doctors had not identified exact triggers for the headaches is incorrect, as her doctors identified stress, hunger, poor sleep, oversleep, sound, light, and Foster's menstrual cycle as triggers.[143] Because stress is an inherent part of the practice of law, Foster argues, it was not sufficient for Principal to simply categorize her job as "sedentary" and ask its reviewing doctors whether Foster could perform a sedentary occupation.[144] Foster asserts that the failure of Principal, Dr. Chafetz, and all other peer reviewing physicians to address her medical condition in relation to her job duties demonstrates that there is no evidence supporting the termination of benefits.[145]

Foster also asserts that the opinions of the psychiatrists who reviewed Foster's medical records at Principal's requests are "suspicious"[146] in that they were unable to provide an opinion on the debilitating nature of Foster's headache disorder due to lack of expertise in that area.[147] In contrast, Foster argues, Dr. Chafetz, who is not qualified to render an opinion on headaches disorder, seems to suggest that Foster does not suffer from headaches.[148] Foster then argues that Chafetz's opinion is of little value because Principal only asked Dr. Chafetz to focus on the psychological and neuropsychological aspects of Foster's condition despite the fact that Foster has

---

[142] *Id.*

[143] *Id.* (citing AR 299, 1255, 3459, 1179).

[144] *Id.* at 9

[145] *Id.* at 8-9.

[146] *Id.* at 9.

[147] *Id.*

[148] *Id.*

never claimed a disability due to mental illness.[149]

Foster next notes that Principal relies on the opinion of Dr. Hoenig, neurologist, who stated that there was no objective evidence of a headache disorder because Foster's diagnostic imaging was normal.[150] Foster contends that Dr. Mohnot, Dr. Savant, Dr. Condon, and Dr. Kondapaneni explained that this is "entirely consistent" with a headache disorder.[151] Foster contends that her headache diary provides objective clinical evidence of her headache disorder and that these four doctors and Ms. Shnaider agree.[152] Moreover, Foster asserts that her prescription medications provide objective evidence of headache disorder.[153]

### c. The mental illness limitation does not apply nor is the issue properly before the Court

Next, Foster argues that the mental illness limitation does not apply in this case and that this issue is not properly before the Court.[154] Foster asserts that Principal never raised this issue as a reason for the denial of benefits during the administrative process; thus, the administrative record does not contain Plaintiff's appeal of such a denial.[155] Even if the Court were to rule on the issue, Foster argues, the mental illness limitation does not apply, as each of her treating doctors agree

---

[149] *Id.* at 10.

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] *Id*.

[154] *Id.*

[155] *Id.*

that she suffers from a headache disorder that is not psychosomatic or opioid induced.[156] Foster

contends that only one reviewing doctor, Dr. Chafetz, appears to suggest that Foster does not have

a headache disorder and that this single opinion among "the opinions of ten other doctors, vast

medical records, headache journals, letters from peers and employers" does not constitute

substantial evidence supporting the conclusion that Foster does not suffer from a headache

disorder.[157] Moreover, Foster avers, even assuming that anxiety and depression contribute to the

disabling condition, because she is disabled due to the migraines independent of any mental health

issues, then she is disabled according to the Group Policy's terms, and the limitation in the Group

Policy would not apply.[158] Foster avers that she has never claimed to be disabled due to a mental

illness.[159]

### d. Principal failed to address all relevant opinions and Foster's job duties

Foster contends that Principal did not respond to her argument that Principal failed to

address all relevant medical reviews, her job duties, and her employer's corroborating

testimony,[160] all alleged to be critical pieces of evidence in support of her ongoing entitlement to

disability benefits.[161] According to Foster, Principal's failure to address this information

---

[156] *Id.* at 11.

[157] *Id.*

[158] *Id.* (citing *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 355–56 (5th Cir. 2015)).

[159] *Id.* at 11–12.

[160] *Id.* at 12.

[161] *Id.*

constitutes an abuse of discretion.[162] Foster further argues that her condition remained chronic throughout the peer review process; thus, all peer review opinions remain relevant and Principal's reliance on the most recent peer review opinions is unjustified.[163]

### e. Principal's conflict of interest must be considered

Foster further argues that the Supreme Court has held that an insurance company's conflict of interest may be considered in determining whether the insurer has abused its discretion.[164] According to Foster, Principal's refusal to consider Dr. Condon's opinion in favor of Foster being considered disabled indicates that its priority was to deny the claim.[165] Moreover, Foster avers that the peer reviews of Dr. Miller, Dr. Chafetz, and Dr. Hoenig that Principal discussed in its denial letters were "tainted by bias," as Foster argues that their "novel theories" did not comport with Foster's medical history and that they did not acknowledge that migraines are a clinical diagnosis.[166]

### f. Principal misrepresented facts

Foster argues that Principal fails to mention in its briefing its first peer review in which Dr. Condon "unequivocally supports Plaintiff's entitlement to LTD and LWOP benefits."[167] Foster further argues the following in response to facts that she avers were either "mispresented or

---

[162] *Id.*

[163] *Id.*

[164] *Id.* at 12–13 (citing *Glenn*, 554 U.S. at 117).

[165] *Id.* at 13.

[166] *Id.*

[167] *Id.* at 14.

presented out of context:" (1) Foster's treating physician, Dr. Mohnot, offered to make himself available after hours to discuss Foster's treatment with the peer reviewing doctor and responded to questions in writing, and Principal refused to pay Foster's doctor for his time;[168] (2) Foster writes when she feels up to it but cannot write on days when she suffers a severe headache and cannot keep a regular work schedule;[169] (3) Principal is unreasonable in using her attempts at productivity against her as writing in her spare time is far different from the stress and deadlines of practicing law as a healthcare attorney; (4) Foster has not written two books since taking disability leave, but rather, one short story and an unpublished manuscript;[170] (5) even if her writing could be construed as employment, the policy provides for continuing disability benefits if Foster cannot perform the material duties of a healthcare attorney and is unable to earn 80% of her pre-disability earnings;[171] (6) it appears from Foster's therapist's notes that Foster thought that her headaches were psychogenic at one point, but other medical records and opinions indicate that her headaches have other causes;[172] (5) the possibility that Foster's headaches were the result of an effort to gain closeness with Foster's husband has been rejected by Foster's therapist, Ms. Shnaider.[173]

### g. Principal wrongly denied Foster's LWOP claim

---

[168] *Id.* (citing AR 3824–3825, 942–943, 2170).

[169] *Id.* (citing AR 319, 1179).

[170] *Id.* at 15 (citing AR 3746).

[171] *Id.* (citing AR 11).

[172] *Id.* (citing AR 704).

[173] *Id.* (citing AR 2791–2792, 289–299).

Next, Foster argues that Principal wrongly denied her LWOP claim and ignored Principal's peer reviewing doctor's opinion that Plaintiff is unable to work on either a full or part-time basis.[174] Although Foster admits that the definition of disability for determination of a LWOP claim differs from the definition of disability applicable to a LTD claim (inability to perform any occupation v. inability to perform one's own occupation), Foster argues that Principal has not identified any alternative occupation or performed any vocational assessment to determine whether Foster is able to perform another occupation.[175] Moreover, Foster contends, Principal's denial letters provide no reasonable explanation as to why Principal disregarded its own peer reviewing physician's opinion that Foster is unable to work either part-time or full-time.[176] According to Foster, it would be difficult to identify an employer that would be able to accommodate Foster's unexpected absences and late arrivals due to incapacitating headaches.[177] Foster further argues that she should not be penalized with termination of the LWOP benefits for her attempt to continue working reduced hours.[178] Foster argues that Principal abused its discretion by not considering her LWOP claim retroactive to the date she reduced her hours on March 8, 2013.[179]

### h. Attorney's fees and costs

Finally, Foster explains that she only intends to move for attorney's fees and costs after the

---

[174] *Id.* at 16 (citing AR 647–649).

[175] *Id.*

[176] *Id.* (citing AR 647 – 649).

[177] *Id.* at 17.

[178] *Id.*

[179] *Id.*

Court has ruled on the merits of the case.[180] Foster notes that the standard for an award of attorney's fees is not strict and requires only "some degree of success on the merits."[181]

**B.    *Principal's Motion for Judgment on the Administrative Record***

### 1.    Principal's Arguments in Support of the Motion

In its cross motion for judgment on the administrative record, Principal seeks an order granting judgment in its favor and awarding Principal reasonable attorney's fees and costs.[182] Principal argues that its termination of Foster's disability benefits was reasonable because Foster did not meet her burden to demonstrate (1) that she is unable to perform the material and substantial duties of her own occupation as a result of her medical condition, and (2) that Principal's determination was arbitrary and capricious.[183]

#### a.    Foster's medical records do not support total disability

According to Principal, the mere diagnosis of a medical condition is insufficient to establish eligibility for benefits.[184] Rather, Principal avers that Foster bears the burden of proving that the symptoms of the diagnosed medical condition prevented Foster from performing the material and substantial duties of her occupation as a healthcare attorney.[185] However, Principal contends, Foster has failed to objectively establish that the symptoms of her diagnosed condition

---

[180] *Id.*

[181] *Id.* (citing *Hardt v. Reliance Standard*, 560 U.S. 242, 256 (2010)).

[182] Rec. Doc. 26 at 1.

[183] Rec. Doc. 26-1 at 18–19.

[184] *Id.* at 19.

[185] *Id*. at 19-20.

prevent her from performing the duties of her occupation, as Plaintiff has not pointed to "a single piece of objective clinical evidence in support of her claim."[186] Principal asserts that Foster's medical records do not contain any abnormal test results and none of her treating physicians or her social worker has placed actual restrictions on Foster.[187] Moreover, Principal contends, Foster had continuous normal neurological and physical examinations, normal EEGs in September 2011 and November 2011, normal brain MRI in November 2012, and her neuropsychological examination revealed full functionality from a cognitive perspective.[188] Specifically, Principal argues that Foster's ability to complete a nine hour neuropsychological examination with a headache of 6/10 demonstrates that Foster has the ability to sustain high cognitive functioning despite experiencing a headache and long hours.[189]

Principal further argues that Foster's therapist identified her headaches as psychogenic and somatic, thus making them symptoms of an emotional and/or mental disorder, rather than physical in nature.[190] However, Principal contends, Foster has pointed to no evidence that the mental or emotional disorder is disabling in its severity. Principal contends that Foster has control over her headaches, able to defer them and reduce their strength through her mind.[191] Principal argues that the psychotherapy notes identify the headaches as a means for Foster to put on the "brakes" in her

---

[186] *Id.* at 21.

[187] *Id.* (citing AR 350 - 374).

[188] *Id.* (citing AR 5345, 5340, 5332, 5327, 5311, 5307, 5296, 5455, 5401, 5396, 350 - 374).

[189] *Id.* (citing AR 350-374).

[190] *Id.* at 22.

[191] *Id.* (citing AR 5155, 5154, 5152, 5148, 5182, 3752, 3759, 366).

life whenever she feels overwhelmed, as a method for obtaining closeness to her husband, and as a way for Foster to stay at home with her children after being shamed by her mother for working full-time rather than parenting.[192] According to Principal, Foster's headaches became chronic when her mother discontinued her willingness to assist with the care of Foster's children.[193] Because Foster did not satisfy the proof of loss requirements set out in the Group Policy and did not meet her burden of proof, Principal argues, its determination was not arbitrary and capricious.[194]

> ### b. Principal could reasonably rely on the opinions of the independent physicians involved in the assessment of plaintiff's medical records

Principal next argues that as a claims administrator evaluating conflicting medical evidence, it was not required to give deference to Foster's treating physicians when determining eligibility for benefits.[195] Principal asserts that it is settled law in the Fifth Circuit that a treating physician's opinion receives no special weight and can be rejected on the basis of reliable evidence with no discrete burden of explanation.[196] Principal asserts that four doctors, Dr. Hoenig, Dr. Miller, Dr. Harrop, and Dr. Register, all found that Foster did not experience neurological or psychological impairment preventing her from working full time.[197] Moreover, Principal avers, its decision to obtain independent medical evaluations is further evidence of a thorough investigation

---

[192] *Id.* (citing AR 3727, 5180, 5157).

[193] *Id.* (citing AR 5201).

[194] *Id.* at 21.

[195] *Id.* at 22 (citing *Black & Decker Disability Plan v. Nord.*, 538 U.S. 822, 832 (2003)).

[196] *Id.*

[197] *Id.* at 24 (citing AR 2186, 2177, 1942, 1904, 1854).

of Foster's claims.[198] Principal maintains that Dr. Chafetz's thorough opinion casts doubt on Foster's self-reports of physical symptoms and concludes that Foster's complaints were psychogenic and somatic in nature.[199] According to Principal, Dr. Chafetz did not believe that Foster experienced symptoms that impaired her functionality to such a degree as to prevent her from performing the material and substantial duties of her own occupation.[200] Given the "myriad of supportive medical opinions" in the record, Principal argues that its decision was not an abuse of discretion.[201]

Additionally, shortly after Principal began paying LTD benefits, Principal obtained surveillance of Foster.[202] Principal maintains that the surveillance showed Foster shopping, driving children to and from school, and visiting with friends.[203] Importantly, a surveillance report identified a company, Confetti Kids, Inc., that was run out of Foster's home and lists Foster as the company's registered agent and principal member.[204]

Principal also cites to specific medical records to support its denial of Foster's claims. Principal notes that beginning in March 2012, Foster attended psychotherapy sessions with Phyllis Shnaider, LCSW, for depression and anxiety and that the intake note described Foster as a stay at

---

[198] *Id.*

[199] *Id.*

[200] *Id.* (citing AR 367-369).

[201] *Id.*

[202] *Id.* at 7 (citing AR 4670, 4668, 4625).

[203] *Id.*

[204] *Id.* (citing AR 4627, 4501-4502, 4494-4495, 4496-4500).

home mom.[205] Foster was noted to have difficulty in social and occupational settings and was diagnosed with depressive disorder NOS and anxiety disorder.[206] Moreover, Principal notes, Dr. Mohnot diagnosed Foster with menstrual migraines, geniconvulsive epilepsy, transient alteration of consciousness and intractual + refractory migraines since July 2008.[207] Dr. Mohnot did not identify any objective findings and did not identify any restrictions or limitations applicable to Foster nor did he make any recommendation of disability.[208]

Principal also notes that on January 22, 2014, Dr. Pranathi Kondapaneni, neurologist and sleep medicine specialist, opined that "[h]eadaches are often made worse by underlying psychiatric disease such as anxiety and depression"[209] as well as that "[d]epression and anxiety significantly worsen headaches."[210] He restricted Foster to part-time work at that time and recommended re-evaluation in one year to see if the restrictions could be lifted.[211] Principal denied Foster's claim for LWOP benefits on May 1, 2014 based on this finding.[212]

Principal further contends that in May 2014 and September 2014, Dr. Mohnot noted that Foster could not function with bad headaches, but Dr. Mohnot did not place any restrictions or

---

[205] *Id.*; AR 5201-5205.

[206] Rec. Doc. 26-1 at 6; AR 5196, 5199, 5184, 5179, 5176,5173, 5167, 5114.

[207] Rec. Doc. 26-1 at 5; AR 5645.

[208] *Id.*

[209] AR 4111.

[210] AR 4114.

[211] Rec. Doc. 26-1 at 8.

[212] *Id.*

limitations on Foster.[213] Dr. Mohnot's medical records show improvement of headaches with injections and herbal medications.[214] In May 2014, Ms. Shnaider opined that Foster was fighting taking her medications and a possible secondary gain motivation for her headaches of achieving closeness to her husband.[215] Importantly, Principal notes that in July 2014, Ms. Shnaider documented Foster's ability to defer headaches until after important events and that Foster was able to resolve her pain through breathing exercises but that the pain returned when Foster became anxious.[216]

In denying Foster's claims, Principal also relied on the opinions of independent clinical psychologist, Sydney Kroll Register, Psy.D. who opined on November 26, 2014, that Foster does not have any "significant functional impairment from a psychological condition."[217] Principal further notes that independent neurologist, Dr. David Hoenig, opined in November 2014 that Foster's neurological exams and workup, such as EEG and MRI, were consistently normal, and Dr. Hoenig found no objective evidence of functional impairment.[218] Importantly, Principal argues, Dr. Hoenig opined that neurologically, there was nothing to indicate that Foster would be

---

[213] *Id.* at 9; AR 4006.

[214] Rec. Doc. 26-1 at 9; AR 3996-3997, 3854.

[215] Rec. Doc. 26-1 at 9; AR 3727.

[216] Rec. Doc. 26-1 at 9; AR 3752, 3749.

[217] Rec. Doc. 26-1 at 10; AR 2186.

[218] Rec. Doc. 26-1 at 10; AR 2175.

unable to perform sedentary work activities on a full-time basis.[219] Considering this evidence, Principal denied Foster's LTD claim as of December 9, 2014.[220]

### c. Foster's claim is subject to the mental health condition limitation

Finally, Principal argues that if the Court concludes that Foster has met her burden of proving that her symptoms were severe enough to prevent her from performing her own occupation – which Principal denies – then Foster's claim is subject to the mental health condition limitation in the Group Policy.[221] According to Principal, the mental health condition limits available benefits for any condition categorized in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, such as somatic symptom disorder, to a period of 24 months.[222]

## 2. Foster's Arguments in Opposition to Principal's Motion

### a. Foster's headaches are not psychogenic or psychosomatic

In opposition, Foster argues that her headaches are not psychogenic or psychosomatic.[223] According to Foster, the only evidence supporting this theory is found in the opinions of two doctors, Dr. Chafetz and Dr. Miller, both of whom Foster asserts "have a significant litigation history."[224] Foster argues that while the doctors opine that her symptoms are psychosomatic and/or opioid induced, neither doctor attempted to reconcile such theories with the fact that Foster has

---

[219] Rec. Doc. 26-1 at 10; AR 2177.

[220] AR 2151.

[221] Rec. Doc. 26-1 at 10 (citing AR 48).

[222] *Id.* at 24–25.

[223] Rec. Doc. 29 at 1.

[224] *Id.*

suffered from headaches since childhood, before she was taking opioids to manage her pain.[225] Foster contends that the Court is not required to rely on the opinions of Principal's reviewing doctors without considering whether the reasoning and basis of those opinions is sufficient to overcome a contrary opinion from a treating physician.[226] Moreover, Foster asserts that Principal is not free to accept its reviewing physician's report without considering whether the conclusions are supported by the underlying evidence.[227] According to Foster, none of the other peer reviewing doctors hired by Principal believed that her headaches were psychosomatic.[228] Foster argues that Principal must analyze all of the pertinent evidence in its denial letters but that Principal ignored those opinions that did not support denial of Foster's claims.[229]

Foster asserts that the opinions of Dr. Chafetz and Dr. Miller are inconsistent with the other reviewing physicians hired by Principal.[230] Foster points to the following opinions that Foster contends support her contentions: (1) Dr. Register stated that the record is "suggestive of pain disorder with no significant mood impairment or other psychological condition;"[231] (2) Dr. Hoenig's diagnosis provides "headache… there is no documentation that would lead to the

---

[225] *Id.* at 1–2.

[226] *Id.* at 2 (citing *Kalish v. Liberty Mut.*, 419 F.3d 501, 508 (6th Cir. 2005); *Roig v. The Limited LTD Prog.*, 275 F.3d 501, 508 (5th Cir. 2001)).

[227] *Id.* (citing *Garrett v. Hartford*, 2007 U.S. Dist. LEXIS 82919 (E.D. Ark. 2007)).

[228] *Id.* at 2–3.

[229] *Id.* at 3.

[230] *Id.* at 2.

[231] *Id.* (citing AR 2185).

conclusion that Ms. Foster may be magnifying symptoms or having issues with secondary gain;"[232]

(3) Dr. Harrop diagnosed "cervicogenic headaches complicated by cervical spondylosis…resulting

in chronic daily headaches;"[233] (4) Dr. Condon opined that Foster is unable to work on a full-time

basis and likely unable to work on a part-time basis due to debilitating intractable migraine

headaches;[234] (5) Dr. Kondapaneni found objective clinical evidence of daily migraine headaches,

history of seizure disorder and functional impairment and opined that Foster must avoid prolonged

exposure to lights (i.e. computers) and workplace stress.[235]

> **b.  No justification exists for Principal's termination of benefits before the 24 month mental health limitation**

As an initial matter, Foster contends that the mental health limitation is not properly before

the Court, as Principal did not deny Foster's benefits due to the 24-month limitation.[236] Until Foster

is given a chance to respond to such a denial during the administrative process, Foster argues, the

issue will not be ripe for review.[237] Nonetheless, Foster argues that even if her headaches are

psychosomatic or result from opioid use, which she denies, there would be no justification for

termination of benefits prior to the 24-month mental health limitation outlined in the Policy.[238]

> **c.  Dr. Chafetz's opinion is goal oriented, internally inconsistent, and misrepresents certain facts found in Foster's medical records**

---

[232] *Id.* at 3 (citing AR 2176, 2175).

[233] *Id.* (citing AR 1941).

[234] *Id.* (citing AR 647-649).

[235] *Id.* (citing AR 847, 861).

[236] *Id.* at 4.

[237] *Id.* (citing *Moore v. Life Ins. Co. of N. Am.*, 2011 WL 10453967 (E.D. La. 2011)).

[238] *Id.* at 3, 4.

Next, Foster contends that the opinion of Principal's peer reviewing doctor, Dr. Michael Chafetz, is "goal-oriented, internally inconsistent, and misrepresents certain facts found in her medical records."[239] In particular, Foster asserts that Dr. Chafetz did not diagnose Foster with a headache disorder, which she asserts is inconsistent with the opinions of all doctors who have reviewed her records or treated her.[240] Foster further asserts that Dr. Chafetz tested for "malingering" and that the results support that Foster is not motivated by secondary gain.[241] Moreover, Foster represents that she scored below her pre-morbid level of functioning on psychological testing and that Dr. Chafetz noted that he could not opine on Foster's legal reasoning ability.[242] Foster contends that Principal and Dr. Chafetz mischaracterize Foster's statements to her therapist as indicating that Foster could control her headaches.[243]

Moreover, Foster contends that Dr. Chafetz's opinion is internally inconsistent, as testing did not demonstrate evidence of somatic disorder.[244] Foster finds Dr. Chafetz's opinion to be "suspicious" in that Dr. Chafetz did not diagnose headache disorder despite the clinical diagnosis shown in her medical records.[245]

Finally, Foster argues that she was a high-achieving healthcare lawyer with many accolades

---

[239] *Id.*

[240] *Id.* at 4–5.

[241] *Id.* at 5 (citing AR 360).

[242] *Id.* (citing AR 367).

[243] *Id.* at 6.

[244] *Id.* at 7 (citing AR 360).

[245] *Id.* at 6-7.

prior to the onset of debilitating headaches that increased in severity in 2012.[246] Foster contends that her psychotherapist's notes indicating Foster's ability to put on the "brakes" were simply documenting a form of treatment in which Foster would relax before the onset of a headache.[247] This does not mean, Foster contends, that she is able to completely control her headaches as Principal seems to suggest.[248]

> **d. Objective clinical evidence shows that Foster is unable to perform her job duties; alternatively, Principal abused its discretion in arguing a lack of objective evidence as the policy does not contain subjective-symptom exclusion**

Next, Foster argues that Drs. Condon and Savant agreed with Foster's treating physician, Dr. Mohnot, that there is no objective testing for migraine headaches, which is a clinical diagnosis.[249] However, Foster argues, there is objective clinical evidence of debilitating headaches, including Foster's headache diaries, which demonstrate that she is unable to perform her job duties.[250] Foster contends that Dr. Kondapaneni, a peer review physician, actually found objective evidence of daily migraine headaches, history of seizure disorder, and functional impairment.[251]

Moreover, Foster contends that Principal's failure to address her job duties as a healthcare attorney indicates that it abused its discretion in denying Foster's claims.[252] According to Foster,

---

[246] *Id.* at 6.

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.* at 8 (citing AR 648, 847, 1679, 1257, 1763).

[251] *Id.*

[252] *Id.*

she met her burden to prove that she in unable to perform her job duties as a healthcare attorney, as all of her doctors and two of Principal's peer reviewing doctors, her employer, her psychotherapist, and the IME doctor agree that her headaches prevent her from doing so.[253] Foster contends that Principal failed to analyze her medical condition in light of her job duties, which required "the utmost ability to concentrate."[254] Moreover, Foster argues, Principal did not ask any of its peer reviewing doctors if they thought that Foster's condition would preclude her from performing her duties as a healthcare attorney.[255]

Foster maintains that Principal's failure to address the opinions of Foster's doctors, as well as the opinions of its own peer reviewing doctors, such as Drs. Condon and Kondapaneni, who believed she suffers from a headache disorder, constitutes a clear abuse of discretion.[256] According to Foster, similar facts were addressed in *Kaufmann v. Metropolitan Life Insurance Company*, a decision from the Eastern District of Pennsylvania, in which Foster represents that the court found that the insurance company could not rely on the opinion of a physician who performed a peer review because the opinion did not depend on an understanding of the plaintiff's job, but rather, on the physician's declaration that there was no objective evidence to support the plaintiff's subjective symptoms.[257] Foster asserts that the *Kaufmann* court found that the insurance company's acceptance of the reviewing physician's opinion, without explaining its decision to

---

[253] *Id.* at 9.

[254] *Id.*

[255] *Id.* at 10.

[256] *Id.* at 11 (citing *Black & Decker Disability Plan,* 538 U.S. at 834).

[257] *Id.* at 11–12 (citing 658 F.Supp.2d 643 (E.D. Pa. 2009)).

choose one opinion over the other, indicated that the insurance company was attempting to deny the claim.[258]

### e. Misrepresentations of fact by Principal

Next, Foster contends that Principal makes several misrepresentations in its brief and argues the following: (1) Foster's medical records are not full of contradictions, as argued by Principal, and her symptoms have been consistently reported; (2) Foster's medical records do not indicate that her headaches are psychosomatic; (3) even if Foster's employer suggested she pursue disability benefits, this does not suggest that Foster is not disabled under the Policy; (4) the fact that Foster helps take care of her children does not mean that she is able to work as a healthcare attorney; (5) Foster's medical chart indicates that she is unable to keep up with household duties and that she is not free to write due to her headaches; (6) Foster is attempting to take as few opioids as possible; (7) Foster has been awarded Social Security disability benefits and has been found unfit to perform the duties of any occupation; (8) Foster is not operating a business out of her home but had only served on the board of a neighborhood nonprofit until resigning, nor were Foster's activities in a non-profit neighborhood organization cited by Principal as a reason for its denial; (9) Foster's attempt to "defer headaches" was ultimately unsuccessful, and Principal cannot present this argument as a post-hoc rationale for claim denial, as it never stated this as a reason for denying Foster's claims; and (10) Foster's maintenance of a Facebook page and blog does not support a termination of disability benefits.[259]

### f. The reviewing court must weigh all relevant factors including Principal's

---

[258] *Id.* at 12 (citing *Kaufmann*, 658 F.Supp.2d at 651).

[259] *Id.* at 13–14 (citing AR 364, 1183, 5223, 4584, 4586, 298–299, 2152).

**conflict of interest to determine whether Principal abused its discretion in denying benefits**

Finally, Foster notes that many of the cases cited by Principal to lay out the standard of review in this matter occurred before the United States Supreme Court articulated the "combination of factors" method of review applicable to ERISA cases like this one.[260] According to Foster, whether there is substantial evidence supporting a denial of benefits is determined by weighing all relevant factors, and any one factor may act as a tiebreaker where the other factors are closely balanced.[261] Here, Foster argues, even if this case were a close call, Principal's conflict of interest could act as a tiebreaker that would tip the scales towards an abuse of discretion.[262] Thus, Foster argues that Principal abused its discretion in terminating her LTD and LWOP benefits.[263]

### 3.    Principal's Arguments in Reply to Foster's Opposition

In reply, Principal maintains that its determination to terminate Foster's benefits was reasonable and that judgment should be granted in its favor.[264] Principal asserts that Foster's case lacks any objective evidence that her headaches – regardless of the etiology – are disabling and preventing Foster from performing the material and substantial duties of her regulation occupation as a healthcare attorney.[265] Additionally, Principal did not cherry-pick the evidence; rather

---

[260] *Id.* at 15 (citing *Glenn*, 128 S.Ct. 2343).

[261] *Id.* (citing *Glenn*, 128 S.Ct. at 2351).

[262] *Id.* at 16 (citing *Schexnayder v. Hartford Life Ins. & Acc. Ins. Co.*, 600 F.3d 465, 471 (5th Cir. 2010)).

[263] *Id.*

[264] Rec. Doc. 36 at 8.

[265] *Id.* at 1.

Principal continued to evaluate the claim as new and more specialized opinions became available.[266] Principal contends that substantial evidence exists to support its termination of LTD benefits.[267]

### a. *Glenn* did not alter the standard of review and the inquiry remains whether Principal's determination is reasonable

In reply, Principal contends that *Glenn* did not alter the standard of review, and the Court's inquiry remains whether Principal's determination is supported by substantial evidence in the administrative record.[268] Whether a plan administrator has a conflict of interest is but one factor for consideration by the court.[269] Thus, Principal asserts, its alleged conflict of interest should not be accorded great weight, if any, and its decision should be upheld as it falls "somewhere on a continuum of reasonableness."[270] Principal further contends that the Court's review is limited to the administrative record and the facts known to the claims administrator at the time of its determination.[271] Thus, Principal argues that the Court cannot consider the additional facts presented by Foster that are not in the record, including an alleged subsequent award of SSDI benefits.[272]

### b. Principal's decision to terminate benefits is supported by substantial evidence

---

[266] *Id.*

[267] *Id.* at 2.

[268] *Id.* at 2-3.

[269] *Id.* at 3.

[270] *Id.* at 4 (internal quotations omitted).

[271] *Id.* at 5 (citing *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir. 1993)).

[272] *Id.*

According to Principal, its decision to terminate Foster's claim is supported by substantial evidence, including the results of the neuropsychological evaluation and "numerous opinions of specialists from December 2014 through 2015."[273] Principal asserts that it never requested or required objective evidence of Foster's headaches.[274] Rather, Principal asserts that it requested objective evidence of functional incapacity, i.e. the restrictions and limitations that prevented Foster from performing her job duties, but that Foster has not presented any such evidence.[275] According to Principal, "the results of her neuropsychological evaluation defeat her claim that objective evidence of a cognitive impairment exists."[276] Principal contends that Foster has not presented any evidence that would defeat Dr. Chafetz's findings as to Foster's cognitive functionality and that Foster's attempt to discredit Dr. Chafetz is unavailing, as his report was not internally inconsistent.[277] Specifically, Principal contends, Dr. Chafetz never suggested that Foster was faking symptoms or malingering as Foster argues; rather, Dr. Chafetz found that Foster was not functionally impaired by the headaches.[278]

### c. Principal did not cherry pick the evidence

Principal asserts that it did not disregard the opinions of its own physicians, Dr. Condon and Dr. Kondapaneni, but rather, changed its position after receipt of additional and more

---

[273] *Id.*

[274] *Id.* at 6.

[275] *Id.*

[276] *Id.*

[277] *Id.* at 6–7 (citing AR 350–374).

[278] *Id.* at 6.

specialized medical opinions.[279] Indeed, Principal initially approved disability benefits in October 2013, in light of Dr. Condon's September 2013 review, in which Dr. Condon concluded that Foster was incapable of "consistent full time employment."[280] After receiving Dr. Knodapaneni's January 2014 assessment, Principal continued paying benefits until December 2014, after Principal received additional and more specialized medical opinions.[281] Principal maintains that an insurer is permitted to change its determination when additional evidence arises.[282]

### d. No evidence exists of biased claim review

Principal also notes that it allowed Foster an additional level of appeal, conducted an independent neuropsychological review in excess of that required by ERISA and the Group Policy, and consulted with numerous specialists to fully evaluate Foster's claims, including evaluating Foster's cognitive abilities in light of the intellectual demands of her occupation.[283] Moreover, Principal asserts, Principal did not communicate directly with the independent consultants so that any potential bias was reduced or eliminated.[284]

### e. Alternatively, Foster's claim is subject to the 24-month mental health limitation

Even if the Court were to find that Foster had met her burden to demonstrate that she cannot perform the duties of her occupation, Principal argues, her claim would still be subject to the Group

---

[279] *Id.* at 7 (citing AR 2151–2154).

[280] AR 4850.

[281] Rec. Doc. 36 at 7 (citing AR 2151-2154).

[282] *Id.* at 8.

[283] *Id.* at 4.

[284] *Id.*

Policy's mental health condition, limiting benefits to a 24-month period.[285]

## III. Law and Analysis

### A.    *Standard of Review for ERISA Claims*

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."[286] When reviewing a denial of benefits made by an ERISA plan administrator, the Court applies a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[287] In such cases, the reviewing court applies an abuse of discretion standard to the plan administrator's decision to deny benefits.[288] In this case, the plan provides that "Principal has discretion to construe or interpret the provisions of this Group Policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided."[289] Therefore, as the plan empowers Principal with discretionary authority to determine eligibility for benefits and to construe the plan's terms, the Court applies an abuse of discretion standard to review Principal's decision to deny Foster's claim for continued long-term disability benefits and life insurance waiver of premium benefits.

The Fifth Circuit has articulated a two-step process for review of a plan administrator's interpretation of its plan. First, the court "must determine the legally correct interpretation of the

---

[285] *Id.* at 8 (citing AR 13).

[286] *Glenn*, 554 U.S. 105 (citing 29 U.S.C. § 1001 *et seq.*; § 1132(a)(1)(B)).

[287] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[288] *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (citing *Bruch*, 489 U.S. at 115).

[289] AR at 22; *see also* AR 117.

plan" and whether the administrator gave the plan a legally correct reading.[290] If the plan administrator's interpretation was legally correct, there is no abuse of discretion.[291] If the plan administrator's interpretation was legally incorrect, then the court must ask whether the plan administrator's decision constituted an abuse of discretion.[292] The Fifth Circuit has held that a court may proceed directly to the second inquiry if the court can more readily determine that the decision was not an abuse of discretion.[293]

The competing motions for judgment on the administrative record address two separate claims: (1) Principal's denial of long term disability benefits beyond December 9, 2014; and (2) Principal's denial of life insurance waiver of premium benefits pursuant to the group life insurance policy's coverage during disability provision.

### B.    *Principal's Denial of Long Term Disability Benefits*

The Group Policy provides that a Member will qualify for disability benefits if all of the following conditions are satisfied:

a.   The Member is Disabled under the terms of this Group Policy.
b.   The Disability begins while he or she is insured under this Group Policy.
c.   The Disability is not subject to any Limitations listed in this PART IV, Section O.
d.   An Elimination Period of 180 days is completed.
e.   A Benefit Payment Period is established.
f.   The Member is under the Regular and Appropriate Care of a Physician.
g.   The claim requirements listed in this PART IV, Section Q are satisfied.

---

[290] *Gosselink v. Am. Tel. & Tel., Inc.*, 272 F.3d 722, 726 (5th Cir. 2001); *Holland,* 576 F.3d at 246, n.2.

[291] *Id.*

[292] *Gosselink,* 272 F.3d at 726. This test applies only in cases, such as the one here, where the administrator has the authority to interpret the plan and participants' eligibility for benefits. *Id.*

[293] *Holland,* 576 F.3d at 246, n.2.

A Benefit Payment Period will be established on the later of:

a. The date the Member completes an Elimination Period; or
b. The date six months before The Principal received Written proof of the Member's Disability. [294]

The definitions section of the Group Policy applicable to long term disability benefits provides:

A Member will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy:

During the Elimination Period and the Benefit Payment Period, one of the following applies:

a. The Member cannot perform one or more of the material and substantial duties of his or her Own Occupation.

b. The Member is performing the duties of his or her Own Occupation on a Modified Basis or any occupation and is unable to earn more than 80% of his or her Indexed Predisability Earnings. [295]

"Substantial and material duties" are defined as the "essential tasks generally required by employers from those engaged in a particular occupation that cannot be modified or omitted." [296]

"Own Occupation (for Attorneys)" is defined as the "specialty in the practice of law the Member is routinely performing for the Policyholder when his or her Disability begins." [297]

The parties provide little discussion as to whether Principal's interpretation of the Group Policy's LTD benefits provisions was legally correct. [298] Rather, the parties dispute whether

---

[294] AR 35.

[295] AR 10-11.

[296] AR 19.

[297] AR 17.

[298] The parties agree that the Group Policy provides an "own occupation" definition of disability. Rec Doc. 25-1 at 11; Rec. Doc. 26-1 at 2.

Principal's denial of LTD benefits was an abuse of discretion. Because the Court can more readily determine whether Principal's denial of LTD benefits was an abuse of discretion, the Court need not consider whether Principal's interpretation of the policy provisions governing LTD benefits was legally correct and instead, proceeds to the second step of the analysis.[299]

### 1.     Abuse of Discretion Standard

The Court's review of factual determinations under the abuse of discretion standard is limited to the evidence contained in the administrative record.[300] As a claimant under §1132(a)(1)(B), Foster bears "the initial burden of demonstrating . . . that [the] denial of benefits under an ERISA plan [was] arbitrary and capricious."[301] "[T]he law requires only that substantial evidence support a plan fiduciary's decision . . . *not* that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability."[302] The Fifth Circuit instructs that "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail."[303] The Fifth Circuit has held:

> Substantial evidence is more than a mere scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . An arbitrary decision is one made without a rational connection between the known facts and the decision or between the facts and the evidence. . . .

---

[299] *Holland,* 576 F.3d at 246 n.2.  As here, the *Holland* parties did not address whether the plan administrator's interpretation was legally correct.  Thus, the Fifth Circuit concluded that the court was permitted to bypass the first inquiry of the two-step analysis and consider only whether the plan administrator's determination was an abuse of discretion.  *Id.*

[300] *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333 & n.5 (5th Cir. 2001) (noting, as an exception to this general rule, that a district court may consider evidence outside the administrative record if it will assist the court in understanding the medical terminology or practice related to the claim).

[301] *Anderson,* 619 F.3d at 512–13.

[302] *Ellis*, 394 F.3d at 273.

[303] *Id.*

> Ultimately, [the Court's review] of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness–even if on the low end.[304]

Moreover, "when a court reviews a plan administrator's decision for abuse of discretion, it must 'not disturb an administrator's decision if it is reasonable, *even if the court would have reached a different decision*.'"[305]

The Court must additionally measure the conflict of interest that arises from the dual role of an entity acting as an ERISA plan administrator and also as a payer of plan benefits, as a factor in determining whether the plan administrator has abused its discretion in denying benefits.[306] However, if a claimant presents no other evidence (other than the company's dual role) as to the degree that a conflict exists and affects the decision to deny benefits, the Court reviews the administrator's decision "with only a modicum less deference than [it] otherwise would."[307] Foster has presented no evidence to establish a conflict of interest beyond Principal's dual role; thus, the Court reviews Principal's determination with substantial deference.[308]

## 2. Analysis

Foster contends that: (1) Principal abused its discretion by basing its denial on an alleged

---

[304] *Corry,* 499 F.3d at 398–99 (citations and internal quotations omitted).

[305] *McCorckle v. Metropolitan Life Ins. Co.*, 757 F.3d 452, 459 (5th Cir. 2014) (citing *Donovan v. Eaton Corp. Long Term Disability Plan,* 462 F.3d 321, 326 (4th Cir.2006) (emphasis in original)).

[306] *Glenn*, 554 U.S. at 108.

[307] *Corry*, 499 F.3d at 398 (quoting *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 301 (5th Cir. 1999) (en banc)).

[308] *See Anderson v. Cytec Indus., Inc.*, No. 07-5518, 2009 WL 911296, at *6 (E.D. La. Mar. 27, 2009) (Feldman, J.), *aff'd,* 619 F.3d 505 (5th Cir. 2010); *Holland*, 576 F.3d at 249.

lack of objective evidence of Foster's migraines, because a migraine diagnosis is clinical, and her medical records provide "overwhelming evidence" of persistent, intractable headaches that supports the inability to perform her job duties as an attorney; (2) Principal abused its discretion by failing to analyze Foster's medical condition in relation to the actual duties of her occupation; and (3) Principal abused its discretion by selectively reviewing evidence in the record.[309] Principal argues that its decision was reasonable and was not an abuse of discretion. Specifically, Principal contends that: (1) Foster's medical records do not support a finding that she is disabled under the terms of the Policy; (2) Principal was entitled to rely on the opinions of the independent physicians involved in the assessment of Foster's medical records; and (3) Foster's claim is subject to the mental health condition limitation.[310]

### a. Whether Principal Terminated Benefits Based on a Lack of Objective Evidence of Headaches

Foster's contention that Principal terminated her LTD benefits based on a lack of objective evidence of headaches is misplaced. Principal initially approved LTD benefits in October 2013, based on a September 2013 report by Dr. Ethel Condon and continued paying LTD benefits in light of Dr. Pranathi Kondapaneni's January 22, 2014 report. Thereafter, Principal continued to assess Foster's disability status and obtained several medical opinions in that regard.

In November 2014, an independent neurologist, Dr. David Hoenig, concluded that Foster's neurological examination was completely normal.[311] Dr. Hoenig opined that there was no

---

[309] Rec. Doc. 25-1 at 14, 16, 18.

[310] Rec. Doc. 26-1 at 19, 22, 24.

[311] AR 2175.

objective evidence of functional impairment, and from a neurological perspective, "there are clinical findings of full functionality with no difficulties."[312] Dr. Hoenig further noted that Foster "has significant mental health pathology" not addressed by Foster's physicians.[313] Importantly, Dr. Hoenig opined that neurologically, there was nothing to indicate that Foster would be unable to perform sedentary work activities on a full time basis.[314] Similarly, independent clinical psychologist Sydney K. Register opined in November 2014, that Foster does not have any "significant functional impairment from a psychological condition."[315] Considering the lack of objective evidence of a functional impairment resulting from the complained of headaches, Principal concluded that Foster was not "Disabled" as defined by the Group Policy, and thus, Principal terminated Foster's LTD benefits as of December 9, 2014.[316]

These findings were confirmed during the appeal process by psychiatrist, Dr. Daniel Harrop, on July 13, 2015, and by Dr. Michael Chafetz who performed an independent neuropsychological evaluation on December 2, 2015.[317] Dr. Harrop opined that "[m]emory, cognition, and concentration are not demonstrated by mental status examination findings to be impaired."[318] Moreover, "the severity of symptoms noted in the medical records do not support

---

[312] *Id.*

[313] *Id.*

[314] Rec. Doc. 26-1 at 10; AR 2177.

[315] Rec. Doc. 26-1 at 10; AR 2186.

[316] AR 2151.

[317] AR 350.

[318] AR 1942.

severity of impairment nor the treatment being provided."[319] Dr. Chafetz highlighted the psychological nature of Foster's headaches, noting that Foster "is meek and unassertive" and has psychological control over her headaches.[320] Foster has learned to use her headaches to "put the brakes on" when she needs her life to slow down, can will her headaches away, and has "considerable control over her pain experience."[321] Dr. Chafetz further noted that Foster's complaints to her physicians are inconsistent with her reports to her therapist, Ms. Shnaider.[322] Ms. Shnaider's therapy notes indicate that Foster uses her headaches to avoid things that cause her discomfort.[323] As Dr. Hoenig noted, "Ms. Foster's functional and daily activity level is not consistent with the severity of the complaints she reports."[324] Importantly, Dr. Chafetz found no evidence of psychological or neuropsychological impairment.[325]

Thus, while Foster's complaints of headaches were "subjectively affecting [her] functionality," no objective or clinical evidence was presented to demonstrate that Foster was functionally impaired by the headaches. The Court finds that Principal did not abuse its discretion in concluding that Foster was not functionally impaired as a result of the headaches.

      **b.  Whether Principal Abused its Discretion in Concluding that Foster was Not Disabled Without Addressing Foster's Specific Job Requirements**

---

[319] AR 1943.

[320] AR 366.

[321] AR 366, 367, 368.

[322] AR 368.

[323] *Id.*

[324] AR 2176.

[325] AR 368.

Next, Foster asserts that Principal abused its discretion by failing to address her medical condition in relation to her actual job duties as a healthcare attorney. Foster bears the burden of proving that she is disabled, i.e., that her medical condition prevents her from performing the material and substantial duties of her occupation as a healthcare attorney.[326] Foster described her specific job requirements as including drafting and reviewing lease agreements, researching and advising clients on government laws and regulations, representing clients in administrative appeals, and drafting compliance plans.[327] Although Foster contends that her physicians concluded that she is unable to work full-time as an attorney, Foster points to no evidence that addresses the specific job requirements of a healthcare attorney. Thus, Foster has not satisfied her burden of proving that she cannot perform one or more of the material and substantial duties of her occupation as a healthcare attorney, and Foster's caim that Principal abused its discretion in failing to address her specific job requirements is without merit.

Moreover, as previously discussed, Drs. Hoenig and Register found no evidence of functional impairment. Rather, Dr. Register concluded that Foster showed signs of depression and anxiety.[328] This is consistent with the opinions of Foster's treating therapist, Ms. Shnaider, who treated Foster for depression and anxiety as early as 2012, and noted that Foster's headaches were associated "with times of stress or just after stress."[329]

Principal's determination that Foster is not disabled as defined by the Group Policy is

---

[326] AR 10-11.

[327] Rec. Doc. 25-1 at 14.

[328] AR 1134.

[329] AR 5201.

further supported by the opinion of Dr. Norman Miller, a physician board certified in both neurology and psychiatry, who found that Foster's medical records indicate an "opioid dependency, opioid induced mood disorder, and opioid induced hypalgesia and somatoform disorder."[330] By report dated July 20, 2015, Dr. Miller found "no evidence documented in the medical records or independent medical evaluation that Ms. Foster is not capable of full-time sedentary work activities as of December 10, 2015 [sic][331] to the present date."[332]

On December 21, 2015, Principal upheld its termination of benefits,[333] citing Dr. Chafetz's conclusion that Foster was able to perform at an average or above average level, even after she had a headache and took medication.[334] The opinions of Drs. Hoenig, Register, Harrop, Miller, and Chafetz provide "substantial evidence" to support Principal's determination that Foster is not "disabled" as defined by the Group Policy. Thus, Principal did not abuse its discretion in terminating LTD benefits, concluding that Foster was not disabled as defined by the Group Policy's LTD provisions.

### c. Whether Principal Abused its Discretion in Relying on the Opinions of Independent Doctors Rather than Foster's Treating Physicians

Finally, Foster's contention that Principal abused its discretion in relying on the opinions of independent doctors rather than Foster's treating physicians likewise is without merit. Although

---

[330] Rec. Doc. 26-1 at 11-12; AR 1807, 1903.

[331] By correspondence dated July 22, 2015, Dr. Miller confirmed that his opinion was effective as of December 10, 2014. See AR 1853 – 1854.

[332] AR 1904.

[333] AR 342–345.

[334] *Id.*

a plan administrator may not arbitrarily ignore a treating physician's opinion, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[335]

As noted, Principal initially approved Foster's claim for LTD benefits in October 2013, in light of Dr. Ethel Condon's September 2013 report. Principal later terminated Foster's LTD benefits in light of the opinions of Drs. Hoenig, Miller, Register, and Chafetz, which provide "substantial evidence"[336] that Foster was not "disabled" as defined by the Group Policy. Notably, the records of Ms. Shnaider, Foster's treating therapist, are replete with evidence that Foster (1) used her headaches to "put brakes on" her life when confronted with difficult tasks;[337] (2) was able to defer her headaches until after an important event or talk them down;[338] (3) was able to resolve her pain through breathing exercises but that the pain returned when Foster became anxious;[339] (4) used her headaches as a way for Foster to stay at home with her children after being shamed by her mother for working full time rather than parenting;[340] and (5) would rather write novels and

---

[335] *Holland*, 576 F.3d at 250.

[336] *See Corry*, 499 F.3d at 398-99.

[337] AR 5155, 5154, 5152, 5148, 5182, 3752, 3759, 366.

[338] *Id.*

[339] AR 3752, 3749.

[340] AR 3727, 5180, 5157.

children's books than work as an attorney.[341] Ms. Shnaider classified Foster's headaches as psychogenic and somatic.[342] Ms. Shnaider noted that Foster was "reacting to having to work," had "feeling of guilt for breaking promise to husband that she would be the breadwinner and he would stay home with kids,"[343] and has "inner resentment that she is not free to just write."[344] Ms. Shnaider also noted that Foster "felt well" when she was free to write, and Foster's husband "expresses strong support for her writing."[345] Principal's reliance on the opinions of Drs. Hoenig, Miller, Harrop, Chafetz, and Register and the medical records of Ms. Shnaider falls "somewhere on a continuum of reasonableness."[346] Thus, Principal did not abuse its discretion in terminating Foster's LTD benefits effective December 9, 2014.

### d. Whether the Mental Health Limitation Applies

Principal determined that Foster's headaches are a symptom of an emotional and/or mental disorder rather than physical in nature based on Ms. Shnaider's classification of Foster's headaches as psychogenic and somatic.[347] However, Principal denied LTD benefits, concluding that the record does not contain evidence that such "emotional and/or mental disorder" had become disabling.[348] Principal asserts that if the Court concludes that the mental disorder is disabling,

---

[341] *See* AR 368.

[342] AR 4574, 4586.

[343] AR 5148.

[344] AR 4586.

[345] AR 5148.

[346] *Id; See Corry,* 499 F.3d at 398–99.

[347] AR 4574, 4586.

[348] *Id.*

which Principal denies, then the LTD benefits are subject to the twenty-four month mental health limitation.[349]

Foster denies that she suffers from a mental health condition. In fact, Foster concedes that she has not filed a claim for mental health benefits under the Group Policy.[350] Moreover, for the reasons stated herein, the Court finds that Principal did not abuse its discretion in concluding that Foster is not "disabled" as defined by the Group Policy. Therefore, Foster is not entitled to 24 months of LTD benefits due to her mental health condition.

C.      *Principal's denial of life insurance waiver of premium benefits*

Foster claims that she was entitled to continuance of her life insurance benefits during her disability without continued payment of premiums; thus, Principal abused its discretion in denying her claim for LWOP. The Group Policy provides that "Premium will not be charged for Member Life and Member Accidental Death and Dismemberment Insurance while the Member's Coverage During Disability is in force."[351] The "Coverage During Disability" benefit provides:

**Article 6 – Member Life Insurance – Coverage During Disability**

A Member may be eligible to continue his or her Member Life and Member Accidental Death and Dismemberment Insurance coverage during the Member's Total Disability.

**a.  Coverage Qualification**

To be qualified for Coverage During Disability, a Member must:

---

[349] The Group Policy provides that disabilities caused by a "Mental Health Condition" are subject to a limited pay period of 24 months. AR 48.

[350] Rec. Doc. 35 at 10–12.

[351] AR 142.

(1) become Totally Disabled while insured for Member Life Insurance; and
(2) become Totally Disabled prior to the attainment of age 60; and
(3) remain Totally Disabled continuously; and
(4) be under the regular care and attendance of a Physician; and
(5) send proof of Total Disability to The Principal when required; and
(6) submit to Medical Examinations or Evaluations when required; and
(7) return to The Principal, without claim, any individual policy issued under his or her Individual Purchase Rights as described in PART III, Section F, Article 1. Upon return of such policy, The Principal will refund premiums paid, less dividends and less any outstanding policy loan balance. [352]

Thus, the threshold requirements for LCDD, and therefore, for LWOP benefits, are proof of "total disability" by a "member" as those terms are defined by the group life insurance policy.[353] Total disability is defined by the group life insurance policy as "[a] Member's inability, as determined by The Principal, due to sickness or injury, to perform the majority of the material duties of any occupation for which he or she is or may reasonably become qualified based on education, training or experience."[354] A member is defined by the group life insurance policy as a person "who is a full-time employee" and "who regularly works at least 30 hours per week."[355] Thus, to qualify for coverage during disability benefits, one must be a full-time employee who regularly works 30 hours per week and who is unable to perform the material duties of any occupation.

Principal denied LCDD benefits, concluding that Foster was not unable to work in any

---

[352] AR 141. Coverage During Disability is effective for a qualified member nine months after the date that the member becomes totally disabled or on the date that the member dies. AR 142.

[353] AR 141-142.

[354] AR 114.

[355] AR 112.

occupation, either on a full or part-time basis.[356] Thus, Foster was not "totally disabled" as defined by the group life insurance policy. Moreover, Principal maintains, Foster ceased being a "Member" as defined by the policy when she stopped working full-time on March 8, 2013; thus, Foster's Group Term Life Insurance coverage ended on April 1, 2013.[357] Because Foster did not have life insurance coverage when she stopped working on June 25, 2013, she was not entitled to LCDD and LWOP benefits.[358]

Foster contends that the policy language does not support the conclusion that Foster ceased to be a "member" when she was forced to decrease her hours on March 8, 2013 due to her worsening medical condition.[359] However, Foster admits that the definition of total disability for determination of her LWOP claim differs from the definition of disability applicable to the LTD claim (inability to perform any occupation v. inability to perform one's own occupation).[360] Because the Court can more readily determine whether Principal abused its discretion in denying LWOP benefits, the Court need not consider whether Principal's interpretation of the LCDD and LWOP beneit requirements was legally correct, and instead, proceeds to the second step of the analysis.[361]

1.     **Whether Principal Abused its Discretion in Concluding that Foster was not "Totally Disabled" as Defined by the Life Insurance Policy**

---

[356] Rec. Doc. 26-1 at 10-11; AR 2164.

[357] *Id.*

[358] AR 2164.

[359] Rec. Doc. 25-1 at 22 - 23.

[360] *Id.*

[361] *Holland,* 576 F.3d at 246 n.2.

Foster has cited no evidence that she is unable to perform the material duties of "any occupation," as required to prove "total disability" under the group life insurance policy. Indeed, Foster admits that she has written one short story and an unpublished manuscript and served on the board of a neighborhood nonprofit since she stopped working as a healthcare attorney.[362] This is evidence that Foster is able to complete the material duties of an occupation and defeats Foster's claim for LCDD and LWOP benefits.

Moreover, disability for purposes of LCDD and LWOP benefits is a more encompassing standard than that needed to prove disability for LTD benefits. Foster concedes that she was able to work part-time from March 8, 2013 until June 25, 2013. In January 2014, Dr. Kondapaneni concluded that Foster could perform part-time work.[363] Thus, Foster was not "totally disabled" as defined by the group life insurance provisions, and Principal did not abuse its discretion in denying LWOP benefits.

Finally, as discussed above, Principal did not abuse its discretion in concluding that Foster is not unable to perform the material duties of her own occupation as a healthcare attorney. Thus, it follows that Foster is not unable to perform the material duties of any occupation. Therefore, Principal did not abuse its discretion in concluding that Foster is not "totally disabled" as defined by the group life insurance policy.

2.    **Whether Principal Abused its Discretion in Concluding that Foster Ceased to be a Member Entitled to Life Insurance Waiver of Premium Benefits**

---

[362] Rec. Doc. 29 at 13-14.

[363] AR 4043. Foster's ability to perform part-time work precludes LWOP benefits.

The group life insurance policy defines a "member" as a person "who is a full-time employee" and "who regularly works at least 30 hours per week."[364] Foster admits that she ceased working full-time on March 8, 2013. Thus, Principal did not abuse its discretion in concluding that Foster was no longer a member at that time, and thus, was not entitled to life insurance coverage. Moreover, entitlement to LWOP benefits is a two-part burden of proof; because substantial evidence exists to support Principal's conclusion that Foster was not "totally disabled" as defined by the group life insurance policy, Foster was not entitled to LWOP benefits. Principal did not abuse its discretion in denying Foster's claim for LWOP benefits.

## IV.    Fees, Costs and Interest

Pursuant to 29 U.S.C. § 1132(g), the Court, in its discretion, may allow a reasonable attorney's fees and costs award to either party. The Fifth Circuit has articulated five factors for district courts to consider in determining whether to award attorney's fees: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions."[365] However, the Fifth Circuit also stated that "[n]o one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court

---

[364] AR 112.

[365] *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980).

should address."[366]

## A.    *Principal's Motion for Attorney's Fees and Costs*

Although Principal's motion includes a request for "such other and further relief as the Court deems just and equitable, including an award of its reasonable attorneys [sic] fees and costs pursuant to 29 U.S.C. § 1132 (g),"[367] Principal provides no argument in support of an attorney's fees and costs award.[368]Moreover, applying the *Bowen* factors to this case, the Court denies Principal's request for attorney's fees and costs.

The first *Bowen* factor concerns the bad faith of a party.[369] No evidence exists that Foster was in bad faith in asserting her claims. Foster cites to several competing medical opinions in support of her claims. Thus, although Principal's denial of benefits is supported by "substantial evidence," some evidence supports Foster's arguments, and it cannot be said that Foster's claims were made in bad faith. The second and third Bowen factors also weigh in favor of denying Principal's request for attorney's fees and costs. No evidence exists that Foster has the ability to satisfy an award of attorney's fees, nor that condemning Foster to pay attorney's fees and costs would deter other individuals from contesting a denial of benefits.

The fourth *Bowen* factor considers whether the party requesting fees and costs sought to benefit all participants and beneficiaries of an ERISA plan or resolve a significant legal question regarding ERISA itself. Certainly, in denying Foster's claim and filing the Motion for Judgment

---

[366] *Id.*

[367] Rec. Doc. 26 at 1.

[368] Rec. Docs. 26, 26-1, 30, 36.

[369] *See Bowen*, 624 F.2d at 1266.

on the Administrative Record, Principal is not seeking to benefit plan participants and beneficiaries. Moreover, Principal's motion does not seek resolution of a significant legal question regarding ERISA itself. Thus, the fourth *Bowen* factor weighs against an award of attorney's fees and costs.

Finally, the relative merits of the parties' position likewise weighs in favor of a denial of attorney's fees and costs. As noted above, Foster's position is not unfounded, it was simply unsuccessful. Considering all of the *Bowen* factors, the Court denies Principal's request for attorney's fees and costs.

**B.      *Foster's Request for Attorney's Fees, Costs, and Interest***

Foster's motion also includes a request for attorney's fees, costs, and pre and post-judgment interest.[370] 29 U.S.C. § 1132(g)(1) permits the Court to award attorney's fees and costs "to either party."[371] Although a litigant need not be the "prevailing party" to obtain a fees and costs award, the United States Supreme Court explained that "a fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)."[372] Foster has not satisfied that standard.  Thus, Foster is not entitled to an award for attorney's fees and costs.[373]

## V. Conclusion

Based on the foregoing, the Court GRANTS, in part, "Defendant's Motion for Judgment

---

[370] Rec. Doc. 25 at 1.

[371] 29 U.S.C. § 1132(g)(1).

[372] *Hardt,* 560 U.S. at 243.

[373] No judgment is awarded in favor of Foster. Thus, Foster's claim for pre and post-judgment interest has no merit.

Pursuant to F.R.Civ.P. 52,"[374] upholding Principal's denial of LTD and LWOP benefits. The Court DENIES Principal's motion to the extent that it requests attorney's fees and costs. The Court DENIES Foster's "Motion for Judgment Based on the Administrative Record"[375] including Foster's request for attorney's fees, costs, and interest. Accordingly,

**IT IS HEREBY ORDERED** that Principal's "Motion for Judgment Pursuant to F.R.Civ.P. 52,"[376] is **GRANTED IN PART**, upholding Principal's denial of LTD benefits beyond December 9, 2014, and denial of LWOP benefits;

**IT IS FURTHER ORDERED** that Principal's "Motion for Judgment Pursuant to F.R.Civ.P. 52,"[377] is **DENIED IN PART** to the extent that Principal requests attorney's fees and costs;

**IT IS FURTHER ORDERED** that Foster's "Motion for Judgment Based on the Administrative Record"[378] is **DENIED**, including Foster's request for attorney's fees, costs, and interest.

**NEW ORLEANS, LOUISIANA**, this __21st__ day of November, 2017.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[374] Rec. Doc. 26.

[375] Rec. Doc. 25.

[376] Rec. Doc. 26.

[377] *Id.*

[378] Rec. Doc. 25.